# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# EASTERN DIVISION

| | |
|---|---|
| NICOLLE ESSMAN, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> NANCY A. BERRYHILL, ) <br> Acting Commissioner of Social Security, ) <br> ) <br> Defendant. ) | No. 4: 18 CV 162 DDN |

## **MEMORANDUM**

This action is before the court for judicial review of the final decision of the defendant Commissioner of Social Security denying in part the application of plaintiff Nicolle Essman for disability insurance benefits under Title II of the Social Security Act (Act), 42 U.S.C. §§ 401-434. The parties have consented to the exercise of plenary authority by the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). For the reasons set forth below, the final decision of the Commissioner is affirmed.

## **I. BACKGROUND**

Plaintiff was born on June 26, 1978 and was 38 years old at the time of her hearing. She filed her application on September 14, 2014, alleging a July 30, 2014 onset date and alleging disability due to bipolar disorder, back pain, foot pain, hip pain, and postpartum depression. (Tr. 155-56, 179). Her application was denied, and she requested a hearing before an Administrative Law Judge (ALJ). (Tr. 91-98).

On January 12, 2017, following a hearing, an ALJ issued a decision finding that plaintiff was not disabled under the Act. (Tr. 18-27). The Appeals Council denied her

request for review. (Tr. 1-6). Thus, the decision of the ALJ stands as the final decision of the Commissioner.

## II.  ADMINISTRATIVE RECORD

The following is a summary of plaintiff's medical and other history relevant to this appeal.

On August 20, 2014, plaintiff met with Keya B. Hindia, D.O., an internist, for follow-up to her recent hospitalization after a failed suicide attempt. She was positive for myalgias and back pain, and having dysphoric mood. She was diagnosed with major depressive disorder. (Tr. 232-33). She underwent a psychological evaluation that same day at Psych Care Consultants and was diagnosed with post-partum depression and bipolar disorder. She was assigned a GAF score of 45, indicating moderate symptoms. (Tr. 257-59).

Plaintiff underwent chiropractic treatment at Baker Chiropractic from August 27, 2014 to October 17, 2016. (Tr. 435-53). An x-ray of her sacrum and coccyx taken on August 29, 2014 was negative. An x-ray of her lumbar spine showed a healing compression fracture at L2. (Tr. 236-37).

From September 3 to October 8, 2014, plaintiff underwent counseling at Psych Care Consultants. She was assigned GAF scores ranging from 52 to 55, indicating mild symptoms. (Tr. 252-56).

Plaintiff saw a psychiatrist, Berette Salazar, M.D., from September 29 through November 26, 2014. Dr. Salazar diagnosed bipolar disorder and prescribed Zyprexa, used to treat bipolar disorder, and Klonopin, for anxiety. Plaintiff's mood was stable and her insight good at a November 26, 2014 appointment. (Tr. 263-73).

On September 30, 2014, plaintiff saw Dr. Hindia and reported ongoing lower back pain radiating to the right hip. (Tr. 571). From December 2, 2014 through January 14,

2015, plaintiff underwent physical therapy for joint pain in the left leg, sacroiliitis, and lumbosacral spondylosis. (Tr. 291-301).

On December 8, 2014, plaintiff saw Dr. Rachel Feinburg, a pain management specialist. Plaintiff was diagnosed with a fracture of L2, thoracic and lumbar spondylosis, severe hypermobility, and bipolar disorder. (Tr. 281). She saw Dr. Feinburg again on January 7, 2015, and received trigger point and facet injections. Plaintiff reported that her knee pain was completely gone and her low back pain was at least 40% improved. (Tr. 485-88).

On January 19, 2015, plaintiff saw Sandra Tate, M.D., for an independent medical examination. Dr. Tate's impression was back pain with L2 compression fracture, bilateral leg pain, and bipolar disorder. Dr. Tate stated she should not lift more than 30 pounds, not bend at the waist repetitively, but was not otherwise restricted. (Tr. 305-06).

On March 4, 2015, plaintiff saw Dr. Feinberg and received trigger point injections in her left piriformis, left gluteal maximus, and right gluteal medius. She saw Dr. Feinberg again two weeks later. Dr. Feinberg thought plaintiff had made "significant progress." (Tr. 467-70). She received trigger point injections from Dr. Feinberg again on April 9, 2015. (Tr. 463).

On April 27, 2015, plaintiff saw Dr. Feinberg for right knee pain. The doctor noted that despite being compliant, she still had difficulty with the right knee and leg and significant myofascial restriction in the lateral aspect of the thigh. (Tr. 458-59). An MRI of plaintiff's left knee showed minimal degeneration and no tears to her meniscus. An MRI of the right and left hips that showed possible mild greater trochanteric bursitis on the right and normal study on the left. An MRI of the lumbar spine showed moderate L2 compression fracture with minimal extension into the canal. The radiologist noted the fracture appeared chronic and without significant edema or soft tissue mass. (Tr. 420, 431-32, 434).

From June 24 through November 19, 2015, plaintiff received treatment at Professional Athletics and Orthopedics for her knee problems. (Tr. 408-19).

On November 11, 2015, Dr. Richard Lehman performed arthroscopic meniscus repair on plaintiff's right knee. (Tr. 424).

From November 9, 2015 through August 10, 2016, she saw Savita Bhat, M.D., a psychiatrist, for medication management and counseling for her bipolar disorder. (Tr. 313-25).

Plaintiff saw Tanya Quinn, M.D., a neurosurgeon, upon the referral of Dr. Lehman. Dr. Quinn believed a spinal cord stimulator was the only surgical intervention available to help plaintiff with her back pain. (Tr. 558).

**ALJ Hearing**

On December 13, 2016, plaintiff appeared and testified to the following at a hearing before an ALJ. (Tr. 32-76). She earned her esthetician license in 2000. She maintains the license but does not currently practice. She lives in a house with her husband and two small children. Her husband and mother do everything, including cooking, cleaning, and taking care of her children. She considers herself homebound and rarely leaves the house. She is able to grocery shop once or twice a month. (Tr. 36-39).

She worked as a loan officer for about one year and quit. She has worked as a front desk clerk, pharmacy tech, dispatcher, and various other jobs. Most recently, she worked for Sprint performing full-time computer phone work. (Tr. 40-44).

She is 5 feet, 1 inch tall and weighs about 207 pounds. She is able to walk around the grocery store. She is unable to do errands due to back pain and because her hips are misaligned. She has back pain that radiates down her legs. She sometimes has pain in her shoulders. She does not take over-the-counter medication because it doesn't work. She lies down multiple times per day to alleviate the pain. She takes Norco, a prescription pain medication, only about once a month because she experiences side effects including

hot sweats and insomnia. She has constant sharp pain in her hips. She still has pain in her knees following her arthroscopic knee surgery. (Tr. 45-51).

She has been diagnosed with bipolar disorder and post-partum depression, and attempted suicide once. She has mood swings once or twice a week. She is all right as long as she is stress-free and has enough help at home. She gets four to five hours of good sleep per night. (Tr. 51- 53).

She is not currently taking any medication for her depression. She has not taken any medication for her mental health during the past four to five months because of side effects. Therefore, she has decided not to take anything. She is not currently under the care of a psychiatrist because she is not taking any medication and does not receive counseling. (Tr. 57-60).

She has had trigger point injections that did not help. She can sit for five or six minutes before she needs to stand up and can lift about five pounds. She has difficulty climbing stairs. She does not take any medication with the exception of thyroid medication and Ibuprofen a couple of times per week. (Tr. 54-57).

Plaintiff's husband also testified that his wife is having physical and psychological problems. Although she can perform light cleaning, he frequently helps her with her shoes and socks because she cannot bend down. He does most of the grocery shopping and cooking, and his mother-in-law helps as well. (Tr. 63-67).

A vocational expert (VE) also testified to the following at the hearing. Plaintiff has past work as a customer service rep (SVP 5, sedentary), loan officer (SVP 7, sedentary), and pharmacy technician (SVP 4, light). (Tr. 71-72). The ALJ posed a hypothetical question that assumed an individual of plaintiff's age, education, and past relevant work, except that the individual could alternate between sitting and standing positions at no greater than 30 minute intervals throughout the day but would remain on task. The VE testified that such an individual could not perform plaintiff's past relevant work.

However, there was other unskilled light and sedentary work the individual could perform such as electrical assembler, marker, order clerk, polisher, and stuffer. (Tr. 71-72).

The VE analyzed and compared the job numbers from the Bureau of Labor Statistics to job numbers calculated by Oasis Software, and found that the job numbers are the same using either methodology. The job numbers provided by the Bureau of Labor Statistics and/or Oasis Software include both part-time and full-time jobs. (Tr. 73-75).

### III. DECISION OF THE ALJ

On January 12, 2017, the ALJ issued a decision finding that plaintiff was not disabled. (Tr. 18-27). At Step 1 of the sequential evaluation, the ALJ found that plaintiff had not performed substantial gainful activity since her July 30, 2014 onset date through the date last insured of December 31, 2015. At Step Two, the ALJ found that plaintiff had the severe impairments of status-post compression fracture at L2, status-post arthroscopic repair of the right knee, bursitis of the hips, and obesity. At Step 3, the ALJ found plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1. (Tr. 20-21).

The ALJ determined that plaintiff retained the residual functional capacity (RFC) to perform light work as defined in 20 C.F.R. 404.1567(b), except that she required a sit/stand option, defined as allowing her to alternate between sitting and standing at no greater than thirty (30) minute intervals throughout the day while remaining on task. She should never crawl or climb a ladder, ropes, or scaffolds. She could only occasionally climb ramps and stairs, stoop, kneel and crouch. In addition, she must avoid concentrated exposure to wetness, humidity, vibration, and the extremes of heat and cold. (Tr. 21).

Relying on the vocational expert's testimony, the ALJ concluded that plaintiff could perform work that exists in significant numbers in the national economy, including light work as an electrical assembler and marker, and sedentary work as an order clerk,

polisher, and stuffer. (Tr. 26-27). The ALJ therefore concluded that plaintiff was not "disabled" under the Act. (Tr. 27).

## IV. GENERAL LEGAL PRINCIPLES

The Court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings apply the relevant legal standards to facts that are supported by substantial evidence in the record as a whole. *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009). "Substantial evidence is less than preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Id.* In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. *Id.* As long as substantial evidence supports the decision, the Court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the Court would have decided the case differently. *See Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A); *Pate-Fires*, 564 F.3d at 942. A five-step regulatory framework is used to determine whether an individual is disabled. 20 C.F.R. § 404.1520(a)(4); *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987) (describing five-step process).

Steps One through Three require the claimant to prove: (1) she is not currently engaged in substantial gainful activity; (2) she suffers from a severe impairment; and (3) her condition meets or equals a listed impairment. 20 C.F.R. § 404.1520(a)(4)(i)-(iii). If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five. Step Four requires the

Commissioner to consider whether the claimant retains the RFC to perform past relevant work (PRW).  *Id.* § 404.1520(a)(4)(iv).  The claimant bears the burden of demonstrating she is no longer able to return to her PRW.  *Pate-Fires*, 564 F.3d at 942.  If the Commissioner determines the claimant cannot return to her PRW, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work that exists in significant numbers in the national economy.  *Id.*; 20 C.F.R. § 404.1520(a)(4)(v).

## V.  DISCUSSION

Plaintiff's sole argument on appeal is that the ALJ erred in failing to produce sufficient evidence to establish that she could perform other work that exists in significant numbers in the national economy.  Specifically, she argues that the vocational expert's testimony was based on an unreliable methodology because the data utilized by the expert did not distinguish between full-time and part-time jobs.  The Court disagrees.

In this Circuit, a vocational expert is neither required to articulate the percentage of available jobs that are part-time or full-time, nor to describe labor market conditions beyond the data that was readily available.  *Welsh v. Colvin*, 765 F.3d 926, 930 (8th Cir. 2014).  Here, the vocational expert testified that there were a significant number of jobs that plaintiff could perform.  (Tr. 73-75).  The vocational expert identified jobs in various representative occupations, whether considering full-time or part-time positions, and demonstrated a significant number of jobs existing in the national economy that plaintiff could perform. (Tr. 26-27, 71-72).

Moreover, to the extent plaintiff contends the vocational expert testified that he determined job numbers using Oasis Software, the record demonstrates otherwise.  The vocational expert testified that he used job numbers provided by the Bureau of Labor Statistics.  He analyzed and compared the job numbers from the Bureau of Labor Statistics

with those jobs numbers calculated by Oasis Software and found the same job numbers using either methodology. (Tr. 73-75).

Accordingly, for the above reasons, the ALJ properly relied on the vocational expert's testimony as substantial evidence to support the step-five findings and disability determination.

## VI. CONCLUSION

For the reasons set forth above, the decision of the Commissioner of Social Security is affirmed. An appropriate Judgment Order is issued herewith.

/s/ David D. Noce<br>
**UNITED STATES MAGISTRATE JUDGE**

Signed on February 13, 2019.